Filed 4/21/25 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>K.D.,<br><br>    Defendant and Appellant. | A168538<br><br>(Mendocino County<br>Super. Ct. No. 21CR01077)<br><br>ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 28, 2025, be modified as follows:

1.    On page 5, the first sentence of the second full paragraph starting, "After the preliminary hearing, the district attorney filed an information alleging the same . . . ." is replaced with:

> After the preliminary hearing, the district attorney filed an information alleging the same three counts in the complaint but deleting the prior on count 3 (§ 666.5, subd. (a)) and charging count 3 as a misdemeanor.

2.    On page 12, the last sentence in the second full paragraph beginning, "We also granted the request of Disability Rights California and Disability Rights Education & Defense Fund to file . . . ." is replaced with:

We also granted the request of Disability Rights California, Disability Rights Defense & Education Fund, California Public Defenders Association, Disability Voices United, Impact Fund, Legal Services for Prisoners with Children, and San Mateo County Private Defender Program to file an amici curiae brief on appeal.

3. On page 14, the last sentence of the first paragraph and its citations stating, "State-run regional centers are responsible for planning and coordinating treatment services for those with qualifying disabilities. (§§ 1001.22, subd. (a), 1001.34; Welf. & Inst. Code, § 4501.)" is replaced with:

The State contracts with and monitors regional centers that are responsible for planning and coordinating treatment services for those with qualifying disabilities. (§§ 1001.22, subd. (a), 1001.34; Welf. & Inst. Code, §§ 4434, 4501, 4620.)

4. On page 39, the counsel designation beginning, "Will Leiner, Andrea Rodriguez, Susan Sindelar, and Claudia Center for Disability Rights California and Disability Rights Education & Defense Fund as Amicus Curiae . . . . " is replaced with:

Will Leiner, Andrea Rodriguez, Susan Sindelar, and Claudia Center for Disability Rights California, Disability Rights Defense & Education Fund, California Public Defenders Association, Disability Voices United, Impact Fund, Legal Services for Prisoners with Children, and San Mateo County Private Defender Program as Amicus Curiae on behalf of Defendant and Appellant.

There is no change in judgment.

Date: _____        _____ P. J.

2

Trial Court:        Mendocino County Superior Court

Trial Judge:        Hon. Keith Faulder

Counsel:            Amanda K. Roze, under appointment by the Court of
                      Appeal, for Defendant and Appellant

                    Will Leiner, Andrea Rodriguez, Susan Sindelar, and
                      Claudia   Center for Disability Rights California,
                      Disability Rights Defense & Education Fund, California
                      Public Defenders Association, Disability Voices United,
                      Impact Fund, Legal Services for Prisoners with
                      Children, and San Mateo County Private Defender
                      Program as Amicus Curiae on behalf of Defendant and
                      Appellant.

                    Rob Bonta, Attorney General, Lance E. Winters, Chief
                      Assistant Attorney General, Jeffrey M. Laurence,
                      Assistant Attorney General, Bridget Billeter and
                      Christine Oh, Deputy Attorneys General, for Plaintiff
                      and Respondent

*People v. K.D.*

A168358

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>K.D.,<br><br>     Defendant and Appellant. | A168538<br><br>(Mendocino County<br>Super. Ct. No. 21CR01077) |

This case presents in stark relief what can happen when a defendant with a developmental disability commits a serious crime, but falls through the cracks in the criminal justice system. The several errors in this case, however, also present the possibility of what defendant's counsel aptly referred to at oral argument as a "teachable moment" for trial courts, regional centers, probation departments, and counsel when faced with a defendant who may be eligible for, and benefit from, cognitive developmental disability diversion under the statutory scheme (developmental disability diversion). (Pen. Code, § 1001.20 et seq.)[1]

Defendant K.D. appeals the denial of her request for developmental disability diversion of her criminal prosecution, arguing that the trial court erred at numerous points along her path from arrest to plea. Although we disagree with some of defendant's contentions, we conclude that the trial

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

court abused its discretion when it denied defendant's request. We conditionally reverse the judgment and remand with instructions.

## BACKGROUND

The facts of this case are both serious and relevant to our disposition, so we describe them in some detail.

*The Underlying Offense*

In June 2021, F.P. drove with her sons in a car with tinted windows to a childcare facility in Ukiah.[2] She parked and left her one-year-old son asleep in the backseat. She left the key fob, her wallet, a tablet, and cell phones in the car. She walked a short distance to the facility's entrance and then heard the Honda accelerate. She saw the Honda being driven quickly away, and a witness called the police.

Officers found the Honda and F.P.'s one-year-old son about two miles away from the childcare facility. Police pulled defendant over and read her her *Miranda* rights, which she waived.

F.P. came to the location where defendant was stopped, looked inside the Honda, and reported that $125 and Medi-Cal cards were missing. Officers found $106 and the Medi-Cal cards in defendant's pockets.

The officer who interviewed defendant testified that she admitted to driving the Honda without permission. Defendant initially told police that she first discovered the child when she looked behind her while she was seated in the car. However, the officer testified, "But later I clarified with her, and I asked her if she knew that there was a child in the car before she

---

[2] This factual recitation is taken from the preliminary hearing where the court heard testimony from the prosecution's investigator and a police detective.

took it, and she said yes." Defendant said "words to the effect of she wanted to get the baby out of the mom's hair."

*Competency Proceedings*

On June 16, 2021, the district attorney filed a complaint charging defendant with kidnapping a child incapable of consent (§ 207, subd. (a); count 1), child abduction (§ 278; count 2), and vehicle theft with a prior (Veh. Code, §§ 10851, subd. (a), 666.5, subd. (a); count 3). Defense counsel declared doubt as to defendant's competency, and the court ordered a section 1368 evaluation.

Dr. Holden evaluated defendant in July 2021 and concluded that she was not competent to stand trial. He opined that defendant "[fell] far short of the legal standard for competency to stand trial, having little factual and rational understanding of legal proceedings and an impaired ability to consult with her attorney in conducting a rational defense." Dr. Holden found substantial evidence that defendant's impaired competency was due to an intellectual disability, and he recommended that she be formally evaluated by the Redwood Coast Regional Center (RCRC) before determination of her placement. The court found that defendant was incompetent to stand trial and ordered RCRC to provide a written recommendation on whether defendant should be placed on outpatient status or confined to a state hospital or other treatment facility.

Around September 2021, RCRC referred defendant to Dr. Wright for evaluation. In his October 2021 evaluation, Dr. Wright reported that defendant had put her "full effort" into his testing, and he concluded that she "clearly" met diagnostic criteria for "intellectual disability-moderate." Dr. Wright observed that defendant had dropped out of school in sixth grade, she was not able to write a grammatically correct paragraph or read an analog

3

clock, and she did not know the months of the year. She scored "[e]xtremely [l]ow" on scales of verbal comprehension, perceptual reasoning, working memory, and processing speed. Her percentile ranks ranged from 0.1 to 2, and her performance placed her full scale I.Q. at 55 (0.1 percentile).

Dr. Wright explained, "Intellectual disability is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains." In individuals with moderate intellectual disability, such as defendant, "[s]ocial judgment and decision-making abilities are limited, and caretakers must assist the person with life decisions." "Practically the individual can care for personal needs involving eating, dressing, elimination, and hygiene, although extended teaching is needed and reminders may be needed. Participation in household tasks can be achieved, although ongoing supports will be typically needed for adult-level performance. Independent employment in jobs that require limited conceptual and communication skills can be achieved, but considerable support from coworkers, supervisors, and others is needed to manage social expectations, job complexities, and ancillary responsibilities such as scheduling transportation, health benefits and money management." Dr. Wright concluded that defendant "has substantial cognitive delays and will need assistance in maintaining herself in a household outside of her being able to take care of her basic day-to-day needs."

In January 2022, after an order to show cause issued, RCRC recommended that defendant be committed to the Department of Developmental Services at the Porterville Developmental Center (PDC) for treatment and competency training. RCRC reported that defendant "went through a formal intake process and was subsequently determined eligible for regional center services on November 03, 2021 based on her moderate

4

intellectual disability." RCRC relayed that it had met with defendant on December 14, 2021, for her initial face-to-face Individual Program Plan (IPP) meeting, and defendant became a regional center client. RCRC offered to provide defendant with competency training in jail while awaiting transfer. January 14, 2022 court minutes reflect the court ordered that defendant be placed at PDC, and it ordered RCRC to provide treatment to her pending transfer.

Defendant was transferred to PDC in approximately March 2022 and received competency training there. Dr. Mann reported to the court that defendant had put in her best efforts and was eager to pass her competency exam. In Dr. Mann's first report, she opined there was a good likelihood of restoration of competency in the foreseeable future. In her next report, Dr. Mann stated that defendant remained cooperative and had regained competency. The court declared defendant competent and reinstated criminal proceedings in August 2022.

*Request for Developmental Disability Diversion*

After the preliminary hearing, the district attorney filed an information alleging the same three counts in the complaint. Defendant pled not guilty, and the court set trial for November 2022.

Defendant moved to continue the trial based on her intent to request developmental disability diversion. In his supporting declaration, defense counsel cited section 1001.20 et seq. and the court's obligation to order reports from the regional center, probation, and prosecution. Defendant submitted RCRC's November 21, 2021 welcome letter to defendant with Dr. Wright's evaluation. The letter stated that defendant was eligible for services with RCRC based on her intellectual disability and her adaptive skills, which were found to render defendant substantially disabled in the

5

areas of learning, self-care, self-direction, economic self-sufficiency and independent living. Defendant also submitted a letter from the manager of the Mendocino County Behavioral Health and Recovery Services, Substance Use Disorder Treatment (SUDT) program, who wrote that defendant had been attending SUDT groups in jail since mid-August 2022, and had not missed a group. The manager stated, "It is my professional opinion that [defendant] would do well in any type of treatment that acknowledges her developmentally delayed condition and works well [within] the individual needs of that [diagnosis]."

At a November 2022 hearing, defendant waived her right to a speedy trial, and the prosecution opposed a trial continuance. The court stated that it had to follow the statute, it accurately recited its duty to order reports from the prosecution, regional center, and probation, and it found that defendant was eligible for diversion. The court orally set dates for the regional center and the prosecution to provide reports, but it omitted mention of a probation report. Compounding this omission, court minutes reflect that the court ordered the prosecution and the regional center to provide reports, but not probation. At the end of the hearing, the court signed an order that defense counsel had provided for RCRC's report.

On December 19, 2022, RCRC submitted a letter to the court stating that defendant qualified for RCRC services, but RCRC could not recommend diversion because services were voluntary. RCRC wrote that defendant: (1) did not have ties to the community; (2) had no relationship with the RCRC authoring services coordinator or RCRC; (3) continued to reoffend; (4) was not a candidate "for 24/7" care; and (5) RCRC was not the "defacto police," and it could not "guarantee that [defendant] will follow [its] recommendations" or attend appointments with probation. RCRC's letter did not include a

6

proposed diversion program, which was required under section 1001.22, subdivision (a).

After reading RCRC's report, at a hearing in January 2023, defendant requested dual agency diversion with probation supervision. The court commented that counsel had not provided the court with any law regarding dual agency diversion and RCRC found that defendant was unsuitable for diversion. The court concluded, "If that's the evidence I'm going to consider today I'm going to deny the motion to divert her . . . ." However, the court indicated that defendant could amend her motion.

In February 2023, defendant filed a motion to reconsider, arguing that the court could order dual agency diversion and highlighting that the court did not have sufficient information to exercise informed discretion because RCRC, the prosecution, and probation had all failed to provide proper reports. Defendant submitted evidence that a community member had offered her housing if she remained substance free, and she qualified for Medi-Cal insurance. The court ordered RCRC, probation, and the prosecution to prepare reports pursuant to section 1001.22 and ordered RCRC to "submit a diversion plan" as derived from an IPP for defendant. Defendant agreed on the record to waive her right to a speedy trial if she were granted diversion.

The prosecution filed a declaration opposing diversion. The prosecution cited the victims' trauma, RCRC's original recommendation against diversion, defendant's "conscious deceitfulness" in giving false names to police, her criminal history, and the violent nature of the crimes charged; the prosecution further argued that defendant was a flight risk. The prosecution maintained that the facts of the crime alone should cause the court to determine the offenses defendant committed were not worthy of diversion,

7

and the prosecution concluded that "[t]he time has come for real and meaningful consequences for this defendant that can only be realized by more restrictive and punitive measures, not less."

RCRC submitted a report with a proposed plan for defendant to (1) develop her IPP within 30 days of her release from custody; (2) comply with reasonable direction from her RCRC service coordinator; (3) attend all counseling sessions and psychiatric consultations once established through a local provider; and (4) take medications as prescribed by her psychiatrist and physician. Defendant was to live with a community member and family friend, and she would be asked to leave that home if she used drugs or alcohol. RCRC reiterated that it could not force defendant's cooperation.

Probation reported on defendant's age, developmental disability, employment background, educational background, ties to community agencies and family, treatment history, and criminal record as follows.

Defendant was 29 and had dropped out of school at the eighth-grade level. Before coming to Ukiah, defendant lived with her mother who supported defendant financially and otherwise. Defendant's mother and eleven-year-old daughter live in Fresno. Defendant had no employment history or assets, but she reported that she could work at the restaurant of the woman who had offered her housing.

Defendant's criminal record consisted of seventeen misdemeanor convictions and one felony conviction in the counties of Fresno, Tulare, and Madera between June 2009 and September 2019, including receipt of a stolen vehicle, drug possession, using or being under the influence of a controlled substance, possession of drug paraphernalia, disorderly conduct, and providing false identification. Defendant's 2018 felony conviction was under section 496d. Defendant had been granted probation numerous times,

8

including formal probation for her felony conviction, and her probation had been revoked eight times. She had two outstanding bench warrants related to misdemeanor charges in Tulare County. While on felony probation, defendant had not stayed in contact with probation as directed, and she failed to follow through with any court-ordered rehabilitative services.

In the interview with the probation officer, defendant said that she took the Honda in the current case because she thought, " 'This is my chance to go home (Fresno, Calif.).' " She been in Ukiah for about a year prior to her arrest to escape a gambling addiction, and she supported herself by panhandling.

Regarding the current charges, defendant said she heard the baby scream from behind her after she took the car; she had not known he was there. She drove around looking for help from a business and some homeless people. She was taking the car back when she was pulled over and arrested. Defendant said she did not intentionally take the baby, and she reiterated that she did not know the baby was in the backseat.

Probation wrote that defendant was polite and cooperative, and she expressed remorse and an understanding that she would need to stay in Mendocino County for diversion. Defendant said she was hoping for diversion, she desired a fresh start, and she would follow through with whatever was asked of her, including remaining sober.

When probation asked defendant about her prior performance on formal probation, defendant admitted that she had stopped reporting because she was " 'homeless' (and left town) and was using drugs." Defendant reported a history of alcohol and drug use, and she believed her alcohol consumption before she stole the Honda affected her decision-making.

Defendant had never engaged in substance-abuse treatment or any other treatment.

Probation opposed diversion. Probation was concerned about defendant's ability to comply with diversion based on her probation history, and it commented that her criminality was escalating and had caused substantial trauma. Regarding her history of noncompliance with court orders, probation recognized that "some of this is by no fault of her own, given her limitations." Probation was nonetheless concerned because diversion services were voluntary. Probation also noted that defendant had two outstanding bench warrants, and she presented a significant flight risk. Probation further stated that it was an "onerous expectation" for defendant to report to two agencies given her disability.

*The Hearing*

At the hearing on the diversion request, defense counsel argued that the court needed to decide whether defendant would benefit from diversion. The court pressed counsel on his diversion plan for defendant, and counsel responded that defendant had a housing offer and was eligible for state insurance and benefits; she was committed to sobriety and engaging in services, and she had participated in services in jail; she would drug test, be monitored by probation on dual agency diversion, have a services coordinator with RCRC, work on her GED, attend counseling arranged by RCRC, receive medication through insurance; and she would meet with RCRC immediately to develop an IPP because RCRC would not meet with defendant in jail. Counsel pointed out that the record did not show what type of services defendant had been offered previously on probation.

The prosecution argued the following. The plan to develop an IPP was "amorphous." Alcohol, rather than defendant's disability, caused the current

10

offense and "weigh[ed] greatly against [defendant]," and defendant had a poor history of probation compliance. The nature of the charged offense, which the court was "absolutely within its rights" to consider, involved deception and traumatized the victims. The prosecutor continued, "So I know that [defense counsel] — and I get it — talked almost exclusively on whether or not the defendant would benefit by a diversion and I know that we're increasingly a defendant-oriented criminal justice system, but it is still appropriate for the Court to consider the underlying offense, the connection to the offense of the developmental disability, and other relevant information, which I submit includes victim impact."

In rebuttal, defense counsel argued that the plan addressed defendant's substance abuse, and the record did not specify what services had been provided to defendant on probation. Counsel took issue with the contention that the plan was amorphous, arguing that RCRC refused to meet with defendant in jail despite the legal obligation that it develop an IPP and offer services. Finally, counsel argued that diversion was the "surest way to reduce recidivism." The court continued the matter.

Before the final hearing, defendant submitted a report from an investigator who had contacted the Tulare County probation officer who prepared defendant's presentence report for her 2018 felony conviction. The Tulare County probation officer said that he had never met or spoken with defendant, he did not know about defendant's I.Q., of 55, whether she could read, or that she had dropped out of grade school. He based his report entirely on CLETS and police reports. Defendant also submitted a certificate establishing that she had completed a parenting class and had earned 20 credits toward her GED.

The trial court orally denied defendant's request for diversion for reasons we set forth in detail *post*. Defendant thereafter entered a plea of nolo contendere to kidnapping of a child pursuant to a plea agreement, and she was sentenced to the low term of three years in prison with custody credits of 865 days.

Defendant timely appealed, and this court granted her unopposed motion to amend the notice of appeal to include a certificate of probable cause.[3] We also granted the request of Disability Rights California and Disability Rights Education & Defense Fund to file an amici curiae brief on appeal.

## DISCUSSION

Defendant was undisputedly eligible for developmental disability diversion, so the question before us is whether the trial court erred in denying defendant's request for diversion. We turn to that question after first addressing whether this appeal is moot, the relevant statutory scheme, and the appropriate standard of review.

*Mootness*

In cases like this one where a defendant has served his or her full sentence, determining whether an issue is moot includes "consideration of whether prejudicial consequences or disadvantageous collateral consequences can be ameliorated by a successful appeal." (*People v. DeLong* (2002) 101 Cal.App.4th 482, 487.) Defendants are entitled to appeal the judgment to clear their names and rid themselves of the stigma of criminality. (See *id.* at pp. 487–492.) The People do not dispute that this principle applies here, and

---

[3] Defendant's amended notice of appeal and receipt of a certificate of probable cause preserved the issue for appellate review. (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 887–888 (*Qualkinbush*); § 1237.5.)

the prejudicial consequences or disadvantageous collateral consequences of defendant's felony kidnapping conviction could be ameliorated if she were granted developmental disability diversion.  (§§ 1001.31 [successful completion of diversion results in dismissal of criminal charges]; 1001.33, subd. (a) [upon successful completion of diversion, arrest upon which the diversion was based "shall be deemed to have never occurred"].)  This appeal is not moot.

*The Statutory Scheme*

The state's diversion programs "generally authorize trial courts to divert eligible persons charged with qualifying offenses from the normal criminal process into treatment and rehabilitation."  (*Wade v. Superior Court* (2019) 33 Cal.App.5th 694, 707 (*Wade*).)  Diversion programs have " ' "well established" ' benefits."  (*Id*. at p. 712.)  "The primary purpose of diversion is rehabilitation."  (*Id*. at p. 707.)  Although section 1001.20 et seq. does not contain a codified statement of purpose, committee reports on bills amending the statutory scheme over the years confirm that the purpose underlying these statutes is to provide treatment that would rehabilitate individuals who committed crimes because of their developmental disability and deter future criminal behavior.  (See Assem. Com. on Public Safety, Rep. on Assem. Bill No. 1956 (2003–2004 Reg. Sess.) Mar. 23, 2004, pp. 3–4 [stating that diversion programs for people with a developmental disability allow the criminal justice system to "solve the problem" of those who commit a crime "as a result of their disability" and should receive treatment].)

The developmental disability diversion program applies in any case where misdemeanor or most felony charges are brought against "any person who has been evaluated by a regional center and who is determined to be a person with a developmental disability by the regional center, and who

13

therefore is eligible for its services." (§ 1001.21, subds. (a), (b).) A "
'[d]evelopmental disability' " "means a disability that originates before an
individual attains 18 years of age, continues, or can be expected to continue,
indefinitely, and constitutes a substantial disability for that individual."
(§ 1001.20, subd. (a); Welf. & Inst. Code, § 4512, subd. (a)(1).) " 'Substantial
disability' " means the existence of significant functional limitations in three
or more of the following areas of major life activity . . . : [¶] (A) Self-care. [¶]
(B) Receptive and expressive language. [¶] (C) Learning. [¶] (D) Mobility. [¶]
(E) Self-direction. [¶] (F) Capacity for independent living. [¶] (G) Economic
self-sufficiency." (Welf. & Inst. Code, § 4512, subd. (*l*)(1).) State-run regional
centers are responsible for planning and coordinating treatment services for
those with qualifying disabilities. (§§ 1001.22, subd. (a), 1001.34; Welf. &
Inst. Code, § 4501.)

Section 1001.22 sets forth specific requirements for the trial courts,
regional centers, probation, and counsel. Importantly, the trial court has a
sua sponte duty to consult with relevant agencies (the prosecution, regional
center, probation, and defense counsel) to determine whether a defendant
may be diverted. (§ 1001.22, subd. (a).) When the court suspects that a
defendant may have a developmental disability, "the [trial] court shall order
the prosecutor, the probation department, and the regional center to prepare
reports on specified aspects of the defendant's case." (§ 1001.22.)

The regional center must submit a report within 25 judicial days with
three key items: (1) a determination of whether the defendant has a
developmental disability and is eligible for regional center services; and (2) a
proposed diversion program, individually tailored to the needs of the
defendant as derived from the defendant's IPP (Welf. & Inst. Code, § 4646),
including treatment addressed to the criminal offense charged; and (3) a

14

statement as to whether the proposed program is available for the defendant through the treatment and habilitation services of the regional centers pursuant to section 4648 of the Welfare and Institutions Code. (§ 1001.22, subd. (a).) The prosecutor is required to submit a recommendation for or against diversion. (*Id.* at subd. (b).) And probation is required to report on specified aspects of the defendant's case. (*Id.* at subd. (c).) The report "shall be based upon an investigation by the probation department and consideration of the defendant's age, developmental disability, employment record, educational background, ties to community agencies and family, treatment history, criminal record if any, and demonstrable motivation and other mitigating factors in determining whether the defendant is a person who would benefit from a diversion-related treatment and habilitation program." (*Ibid.*)

Upon receipt of the reports, if the defendant is found to have a developmental disability and to be eligible for regional center services, the court shall determine whether to grant diversion. (§ 1001.23, subd. (a).) "After consideration of [the required reports and the prosecutor's recommendation], the defendant's violence and criminal history, the relationship of the developmental disability to the charged offense, and the current charged offense, and any other relevant information, and the court is satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community, the court shall determine if the defendant shall be diverted under either dual or single agency supervision, and referred for habilitation or rehabilitation diversion pursuant to this chapter. If the court does not deem the defendant a person who would benefit by diversion at the time of the hearing, the suspended criminal proceedings may be reinstituted, or any other disposition

15

as authorized by law may be made, and diversion may be ordered at a later date." (§ 1001.23, subd. (b).)

A defendant may be diverted on single agency diversion, administered by the regional center, or dual agency diversion, administered jointly by the probation department and regional center. (§§ 1001.20, subds. (f), (g), 1001.22, subds. (b)(2)–(4), 1001.23, subd. (c), 1001.28.) The court may revoke diversion and reinstate criminal proceedings in statutorily-specified circumstances. (§ 1001.29.) If a defendant is diverted and successfully concludes his or her diversion program, the criminal charges are dismissed, and the underlying arrest is deemed never to have occurred. (§§ 1001.31, 1001.33.)

*Standard of Review*

The standard of review on appeal from a trial court's denial of diversion under section 1001.20 et seq. has not been addressed by any published decision, although determinations under other statutory diversion schemes are uniformly reviewed for abuse of discretion. (*People v. Moine* (2021) 62 Cal.App.5th 440, 448 (*Moine*) [abuse of discretion standard applies to mental health diversion decision under § 1001.36]; *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147 [same]; *Wade, supra*, 33 Cal.App.5th at p. 708 [military diversion]; *Morse v. Municipal Court* (1974) 13 Cal.3d 149, 153, fn. 2 [drug diversion].) We conclude that the abuse of discretion standard applies here as well for the following reasons.

First, while some parts of the statutory scheme are mandatory (e.g. § 1001.22 [court must order reports when it suspects defendant has a developmental disability]), the Legislature used permissive language when discussing the court's determination of whether to grant diversion. (§ 1001.22, subd. (a) [court shall consult with agencies to determine "*whether*

16

*a defendant may be diverted*" (italics added)]; § 1001.22, subd. (b)(4)(C) [if prosecution recommends dual agency diversion, it must give a report to defendant with a clear statement that "*the court may decide* in a hearing not to divert" defendant]; cf. *Moine, supra,* 62 Cal.App.5th at p. 448 [" 'may' " connotes a permissive discretionary standard].)  Second, the statute requires the court to consider and balance various factors, and it signals deference to the court's assessment of whether the defendant is a person who would benefit from diversion.  (§§ 1001.22, subds. (a)–(c) [requiring the submission of reports to the court], 1001.23, subd. (b) [noting that, after considering reports, the court may reinstitute criminal proceedings "[i]f the court does not deem the defendant a person who would benefit by diversion at the time of the hearing"].)  Likewise, by requiring that the trial court be satisfied that defendant does not pose an "unreasonable risk" to public safety (§ 1001.23, subd. (b)), the statute directs the court to perform a discretionary function. (*Moine*, at pp. 448–449 [finding same for similar language in section 1001.36, subd. (b)(1)(F)].)

A trial court abuses its discretion when its determination exceeds the bounds of reason, or its decision is so arbitrary or irrational that no reasonable person could agree with it.  (*Wade, supra*, 33 Cal.App.5th at p. 708.)  The trial court similarly abuses its discretion when its express or implied factual findings are not supported by substantial evidence.  (*Moine, supra*, 62 Cal.App.5th at p. 449.)

"But judicial discretion must also be ' "guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice." ' [Citation.]  [¶]  This understanding is essential to assess the scope of judicial discretion conferred by statute.  It means that 'all discretionary

17

authority is contextual . . . .' [Citation.] A reviewing court 'cannot determine whether a trial court has acted irrationally or arbitrarily . . . without considering the legal principles and policies that should have guided the court's actions.' [Citation.] [¶] Where the source of discretion is statutory, we measure the trial court's exercise of judicial discretion 'against the general rules of law and . . . against the specific law that grants the discretion.' [Citation.] 'If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal.' [Citation.] Simply stated, 'an abuse of discretion arises if the trial court based its decision on impermissible factors [citation] or on an incorrect legal standard.' " (*Wade*, *supra*, 33 Cal.App.5th at pp. 708–709.)

Here, the relevant statutes do not create a presumption in favor of diversion, as defendant claims. (§§ 1001.21, 1001.22, 1001.23.) Nonetheless, the trial court's exercise of discretion must be informed by the rehabilitative purpose of the diversion statutes. (See *Wade*, *supra*, 33 Cal.App.5th at pp. 707, 716–717; *Qualkinbush, supra,* 79 Cal.App.5th at p. 891.) The court must first be satisfied that, if treated in the community, a defendant will not pose an unreasonable risk to public safety, as defined in section 1170.18. (§ 1001.23, subd. (b).) If the court is satisfied that a defendant will not pose an unreasonable risk to public safety, the court's determination of whether to grant diversion, and hence its consideration of the statutory criteria and information relevant to that decision, must be based upon the standard specified in the statute: whether the defendant is a person "who would

18

benefit by diversion." (§ 1001.23, subd. (b); cf. *In re C.W.* (2012) 208 Cal.App.4th 654, 660 [finding same for juvenile deferred entry of judgment statutes using language similar to §§ 1001.22, subd. (c), & 1001.23, subd. (b)].)

*Analysis*

 1. Additional Factual Background

The trial court denied defendant's request for diversion in an oral ruling as follows:

"First, I want to address the sufficiency or the specificity of the diversion plan. [¶] . . . [¶] There are certainly specifics such as a place to live and vendors that may be able to provide services should the court order this diversion. [¶] [RCRC's] biggest concern is there are no established services with [defendant,] and she has never received any services through RCRC, and they're concerned about their ability to supervise her . . . . Probation has some of those same issues.

"Moving forward from whether or not the plan has enough specificity, a more important consideration for the court is both her ability and willingness to comply with diversion . . . . [¶] And I understand that [defendant] has some ability to comply with any diversion plan that would be put in place based on her performance in a custodial setting [at PDC]. She performed well in that custodial setting. [¶] The bigger concern[ ] for the court here is if she weren't in the custodial setting would she have that same ability and willingness to comply. [¶] And I understand she's willing to accept diversion and willing to waive time to accomplish any plan. But it's clear she doesn't have any misdemeanor connection to this county other than the fact this is where the alleged crimes were committed. [¶] Her support systems, such as they were . . ., are in Fresno County where her mother and her daughter live.

19

And she has connections in Tulare and Madera County and Fresno County. All of those connections are based on prior criminal conduct in each of the three counties. [¶] [Defendant], according to all the information I've received, although she's able to support herself in some fashion has never worked, has no income other than any benefits that might be provided by the government and she has no assets.

"The most concerning thing to the court is her criminal history. If this were her first offense or only her second offense the court might be able to find some connection to the criminal conduct with the developmental disability. [¶] In this case I accept that the crime was not a planned-out crime, that in — in some sense it was opportunistic. She saw a vehicle with the engine running. Before she got into that vehicle she knew it wasn't her car. She knew there was an infant in the car seat. She knew that it was wrong to take the car and the child. [¶] That was based on — those conclusions are based on the reports and her conduct after she was apprehended. I accept she may not have fully understood the consequences of her actions or to the mother of that child, but I can't overlook how serious this offense was taking a 17-month-old child from her mother in her mother's car and driving away.

"When I look at her criminal history it's important to note that there has been deception in her past, not just in this case where she gave a false name, but she has used eight different names over the course of her criminal history, which is extensive. [¶] . . . I'm reasonably certain that she's 29 years old, and her first criminal offense was in 2009 when she had just turned 18. Since then, there have been 18 convictions, admittedly many of them were drug offenses and paraphernalia cases. [¶] She had one felony conviction. But out of those 18 convictions, including the one felony, she was placed on

20

probation eight times. She was found in violation of her probation eight separate times, including three for her felony conviction in 2018. [¶] After three felony violations on formal probation she was committed to local prison. Since her release from local prison the way I have seen it in the reports is that she has had seven misdemeanors, including – they're all drug offenses. [¶] So if I'm doing my math right in her adult life there was never a time where she wasn't either in custody or on probation. . . [¶] . . . The fact that all of her prior offenses were non-violent offenses, but this was a violent offense.

"And [based] on all of the facts in this case although I'm finding [defendant] does have a developmental disability and she's eligible for regional center services, I can't find that her developmental disability is reasonably related to the charged offense, that the current charged offense is an extremely serious offense. [¶] And although I don't think she poses an unreasonable risk as defined by 1170.18, I do find that based on all of the relevant information that placing her on diversion would not benefit her at this time.

"I don't think that she would take advantage of any services that the regional center would be able to provide to her that haven't already been provided to her. And her history is one of non-compliance with the reasonable terms of probation. [¶] So for all of those reasons I am going to deny the request . . . under [section] 1001.20."

2. The Trial Court Committed Reversible Error

Defendant argues that the trial court abused its discretion by relying on improper criteria and by making certain findings that were not supported by substantial evidence. She also contends that the trial court and RCRC failed to fulfill their statutory obligations. Although the People concede that the court erred in its consideration of two factors, the People maintain that

the trial court properly considered some criteria, substantial evidence supports the court's decision, and any error was forfeited or harmless.

For the reasons set forth below, we agree with some of defendant's contentions and find that the court committed reversible error.

A. Defendant's Purported Out-of-County Residence

Defendant argues that the court erroneously determined she was an "out-of-county" resident with no connections to Mendocino County, and then used this finding to deny her diversion in violation of the statutory preference for diversion and her right to equal protection and due process. Defendant has not established error here.

First, the court did not make a finding about defendant's county of residence. The court stated that defendant "doesn't have any misdemeanor connection to this County" other than the fact the crimes were alleged to have been committed there, it found that defendant's mother and daughter (defendant's support systems) lived in Fresno, and defendant had criminal convictions in the counties of Fresno, Tulare, and Madera. The last two findings are supported and undisputed. And as to the court's first finding, assuming that the court found that defendant lacked personal connections to Mendocino County (as opposed to her having "no misdemeanor connection" thereto), the court's finding is not reversible. The record contained evidence that defendant had lived in Fresno for most of her life, she had been in Ukiah for about a year before the offense and came to escape a gambling addiction, and she did not have a fixed residence in Ukiah. Defendant had met a friend in jail whose mother had offered to house her, but the court could conclude based on this evidence that defendant's personal ties to Mendocino County were not significant. We do not reweigh the evidence or second guess the

22

trial court's determination. (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079.)

Next, we cannot find that the court erred by considering defendant's respective personal ties to Mendocino County and to her family in determining whether she would benefit from diversion-related treatment: The statutory scheme requires probation to report on a defendant's ties to family, and it requires the court to consider these ties along with any other relevant information. (§§ 1001.22, subd. (c), 1001.23, subd. (b).) In order to benefit from diversion-related treatment, a defendant must participate, so we are unpersuaded by defendant's broad contention that the court could not consider any residence-related information that bore on whether she would participate in diversion services and treatment.

Finally, we decline to consider defendant's cursory equal protection and due process arguments. (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1372, fn. 12 [declining to address issue not adequately raised in opening brief because "cursory treatment in . . . opening brief does not constitute an adequate presentation of the issue"].) Again, the statutes at issue direct the court to consider a defendant's ties to family and any other relevant information in assessing whether a defendant would benefit from diversion. (§§ 1001.22, subd. (c), 1001.23, subd. (b).) Defendant concedes that rational basis review would apply to an equal protection claim, and then merely asserts that "[t]he court erred by treating [her] less favorably on the basis that her mother and daughter live in Fresno, and she purportedly did not have strong connections to Mendocino County." Defendant made no effort to show the statutory considerations discussed by the court were not rationally related to a legitimate state purpose. For her due process argument, she

23

provides only a one-sentence conclusion that "the court deprived her of due process by relying on an improper factor." These arguments are forfeited.

B. Defendant's Criminal Record

Defendant next makes a blanket claim that the court improperly considered her prior criminal convictions and her past performance on probation.

With respect to defendant's probation history, this claim is unpersuasive. Her criminal record includes her past performance on probation, and the court observed that defendant had been placed on probation eight times, and had been found in violation of probation eight times. While there is no evidence that defendant was ever offered treatment for her developmental disability, the record contains evidence that she was ordered to participate in rehabilitative services during her 2018 felony probation and she did not follow through and engage in these services as directed. Defendant was also placed on probation in 2014 pursuant to section 1210.1, pursuant to which the court "shall require participation in and completion of an appropriate drug treatment program," but she had never engaged in substance abuse treatment services. Stated simply, the Legislature has deemed prior performance on probation relevant for the court's consideration (§§ 1001.22, subd. (c), 1001.23, subd. (b)), and the trial court correctly reviewed this information through the lens of whether defendant would benefit from diversion-related treatment.

Defendant also unpersuasively argues that her past convictions should have been discounted in their entirety because "[t]he only reasonable conclusion . . . is that [she] was incompetent at the time of her prior convictions." Notwithstanding defense counsel's unsupported speculation as to defendant's competency at the time of her numerous prior convictions,

24

defendant's prior convictions were final and have not been set aside in any collateral proceeding. We accordingly reject defendant's claim that the trial court could not consider her prior convictions because she was incompetent when they were sustained.[4]

The trial court did, however, err in some respects in its consideration of defendant's prior convictions. The trial court relied on the number of defendant's prior convictions to conclude that the current charged offense was not reasonably related to defendant's developmental disability. For the reasons explained in section 2.C. *post*, this was error. The trial court also stated that defendant had used deception in the past — specifically, she gave false names to the police — and she had done so with respect to the charged criminal offense. For the reasons explained in section 2.D. *post*, the court erred in the way it considered this aspect of defendant's criminal history.

## C. The Relationship of the Developmental Disability to the Charged Offenses

Here, defendant claims that the trial court erred by: (1) adding to the statutory scheme the eligibility requirement that developmental disability be a significant factor in the commission of the charged offenses akin to the mental health diversion statute (§ 1001.36, subd. (b)(2)); (2) not limiting its consideration of the relationship of the developmental disability to the charged offenses to its assessment of whether defendant posed an unreasonable risk of danger if treated in the community; and (3) making an unsupported determination that her developmental disability was not related to the charged offenses. We address each argument in turn.

---

[4] We note, however, that it is unclear why defendant's developmental disability for years escaped the notice of her attorneys, the trial courts, and the probation departments involved in her numerous prior cases.

25

Turning to defendant's first assertion of error, unlike other diversion statutes, section 1001.23, subdivision (b) does not include a stand-alone requirement that the defendant prove that his or her developmental disability was a significant factor in the commission of the charged crime. (Compare §§ 1001.23, subd. (b) & 1001.36, subd. (b)(2) [mental health diversion], 1001.80, subd. (c) [military diversion for felonies].) Nonetheless, the record does not show that the trial court required the defendant to prove such a connection; instead, the record reflects that the court properly treated the relationship between defendant's developmental disability and the charged offense as a factor it could consider in making its determination. (§ 1001.23, subd. (b) ["After consideration of . . . the relationship of the developmental disability to the charged offense, and the current charged offense, and any other relevant information . . . the court shall determine if the defendant shall be diverted . . . ."].)

The next question is whether the court erred by failing to confine its consideration of "the relationship of the developmental disability to the charged offense" to its evaluation of whether a defendant would pose an unreasonable risk to public safety. (§ 1001.23, subd. (b).) The Legislature added the language at issue as an express factor for the court's consideration in 2021 when it expanded this diversion scheme to felonies, along with the requirement that the court find that a "defendant will not pose an unreasonable risk of danger to public safety . . . if treated in the community." (Stats. 2020, ch. 11, §§ 17, 21.) But, contrary to defendant's assertion, the statute's language does not limit consideration of "the relationship of the developmental disability to the charged offense" to the court's unreasonable risk assessment. (§ 1001.23, subd. (b).) As the People point out, the existence of a relationship between the developmental disability and the charged

26

offense has always been relevant to the fundamental assessment of whether a defendant would benefit from rehabilitative treatment. And the statute has always allowed the court to consider any "other relevant information" in making its diversion determination. (Former section 1001.23, subd. (b), added by Stats. 1980, ch. 1253, p. 4235, § 1.) For these reasons, we reject defendant's argument that a trial court may consider "the relationship of the developmental disability to the charged offense" only insofar as it bears on the determination of whether the defendant would pose an unreasonable risk to public safety if treated in the community.

The final question posed is whether the court erred in finding there was *no* relationship between defendant's disability and the charged offenses. On this question, the People concede error and admit this relationship should have been a factor in favor of granting diversion. In doing so, the People effectively concede that the only reasonable conclusion is that defendant's developmental disability was related to the charged offenses and the trial court's contrary finding lacks the support of substantial evidence. After reviewing the evidence, we accept the People's concession.

Undisputed evidence established that defendant had a moderate intellectual disability with substantial cognitive delays and substantially impaired adaptive skills in the areas of learning, self-care, self-direction, economic self-sufficiency and independent living. Defendant had deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience; she also had deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards of personal independence and social responsibility. Without ongoing support, Dr. Wright opined that defendant's adaptive deficits limited her functioning in one or more activities

27

of daily life, such as communication, social participation, and independent living across multiple environments, such as home, work, and community.

At the time of the alleged crime, defendant did not have a fixed residence, she was supporting herself by panhandling, and she thought it was her chance to " 'go home' " when she saw the victim exit the Honda. Probation reported that defendant had a "lack of impulse control" leading to criminal conduct, and the trial court itself accepted that defendant did not fully understand the consequences of her actions.

Furthermore, the trial court suggested that it might be able find "some connection to the criminal conduct with the developmental disability" if this were defendant's first or second offense. As defendant points out, however, a developmental disability "continues, or can be expected to continue, indefinitely" (Welf. & Inst. Code, § 4512, subd. (a)), and defendant had never received treatment for her developmental disability. We see no reasonable basis to conclude that defendant's alleged criminal conduct might have been connected to her developmental disability if it were her first or second crime, but the same disability, which included deficits in intellectual functions such as learning from experience, had no connection to the same alleged criminal conduct simply because defendant had numerous convictions on her record.

In sum, the evidence in the record does not support the court's finding that the defendant's developmental disability had no relation to the charged offense.

D. The Charged Offenses

Defendant next maintains that the court erred in its consideration of the charged offenses and treated the diversion determination like an ordinary sentencing hearing instead of utilizing the charged offense to assess whether she was amenable to treatment. The People concede that the trial court

28

"improperly considered the charged offense without considering its specific role in rehabilitation." For the reasons set forth below, the People's concession is well-taken.

*Wade* — upon which defendant relies — addressed an argument similar to defendant's in the context of military diversion. (*Wade*, *supra*, 33 Cal.App.5th 694.) There, the defendant was charged with misdemeanor driving under the influence of alcohol and driving with 0.08 percent or higher blood alcohol, and sought to be placed on pretrial military diversion. (*Id.* at p. 701.) In deciding whether to grant the defendant's request for military diversion, the trial court considered an "information sheet" of factors derived from the felony sentencing guidelines in the California Rules of Court, including the " 'inherently dangerous' " nature of the offense, the defendant's blood-alcohol concentration, his " 'nonpassive' " role in committing the offense, and his purported " 'bad driving' " at the time of the offense. (*Id.* at pp. 703–704, 716.) The appellate court found that the trial court's consideration of the information sheet of factors was not legal error in and of itself, but concluded that the trial court had not exercised informed discretion because its consideration of certain criteria was not guided by the appropriate legal principles — specifically, there was no basis on which to infer that the court related the criteria on which it relied to the defendant's suitability for treatment and rehabilitation. (*Id.* at pp. 714–716 [the trial court's "explanation for denying pretrial diversion gave no indication that it was informed by the rehabilitative principles that define the military diversion statute"]; see also *Qualkinbush, supra,* 79 Cal.App.5th at pp. 885, 890–892 [court abused its discretion in denying mental health diversion by concluding use of force in charged crimes required punishment and

29

deterrence and failing to consider primary purpose of mental health diversion statute].)

The trial court here similarly erred. The prosecution urged the court to impose punitive consequences on defendant and to deny diversion because of the nature of the charged crimes and their lasting impact on the victims. Against that background, the court found defendant's criminal history "most concerning." It stated, "[B]ut I can't overlook how serious this offense was taking a 17-month-old child from her mother in her mother's car and driving away," and the court commented on the violent nature of the crime. The court also observed that defendant used deception in connection with the charged offense and had done so in the past. And, after finding the offense was not related to defendant's disability, the court reiterated, "[T]he current charged offense is an extremely serious offense." The court concluded that it did not think defendant would benefit from diversion based on "all of the relevant information," but it explained that this was so because the court did not believe that defendant would participate in diversion-related treatment. As the People concede, and similar to *Wade,* the record shows that the court's consideration of the charged offenses was not an exercise of informed discretion because there is no basis on which to infer that the court considered the charged crimes *as they relate to* the only relevant question the court had to assess after determining that defendant was eligible and would not present an unreasonable risk to public safety: whether, in light of the purposes of the disability diversion scheme, defendant would benefit from diversion-related treatment. Although we recognize the serious and frightening nature of the crimes in this case, the trial court erred in denying diversion on that basis without linking the facts of the charged offenses to the

30

fundamental question of whether defendant would benefit from diversion. (§ 1001.23, subd. (b).)

E. Employment History and Assets

The court cited defendant's unemployment and lack of assets as a factor it considered in concluding that defendant would not benefit from diversion, and defendant argues that the court improperly used this factor against her. On this record, we agree.

Defendant was diagnosed with significant functional limitations in independent living and economic self-sufficiency, and she had never received treatment for her developmental disability. Dr. Wright opined that for individuals with developmental disabilities like defendant's, independent employment in jobs that require limited conceptual and communication skills could be achieved with considerable support from coworkers, supervisors, and others to manage social expectations, job complexities, and ancillary responsibilities such as scheduling transportation, health benefits, and money management. The regional center was required to provide a diversion treatment program tailored to defendant's individual needs (§ 1001.22, subd. (a)), and an appropriate proposed diversion program would therefore include some form of economic habilitation or rehabilitation and the possibility of sheltered employment.[5] (§ 1001.20, subd. (b), 1001.34.)

---

[5] Although defendant had been found eligible for regional center services in November 2021, as of March 2023, RCRC had still not completed an IPP for defendant and therefore proposed what can only be called a generic — not "individually tailored" — proposed plan for diversion, with statements such as, "[defendant] is expected to comply with reasonable directions" from an unspecified RCRC coordinator, and "[defendant] will attend all counseling sessions and psychiatric consultations once established through a local provider," and "will take medications as prescribed." (§ 1001.22, subd. (a).)

Defendant was also eligible for government insurance, she could cook and had helped at her aunt's restaurant in the past, and she had an offer to live with a community resident and work at her restaurant. Thus, while defendant had no prior employment history or assets, the only evidence in the record was that treatment for her developmental disability could assist her in achieving economic-self-sufficiency. In these circumstances, defendant's lack of economic self-sufficiency does not logically support a finding that she would not benefit from diversion-related treatment, and the trial court erred in determining that her economic status weighed against diversion.

F. The Duties of the Trial Court and RCRC

Defendant and amici curiae contend that the trial court did not satisfy its duties under section 1001.20 et seq. when criminal proceedings were restored in this case because the court failed to initiate the diversion process sua sponte and to ensure that the relevant agencies provided reports. We agree.

The trial court in this case fell short of performing its statutory obligations in this case for many months. RCRC informed the court that defendant had a developmental disability that qualified her for regional center services in January 2022 — well before the August 2022 reinstatement of criminal proceedings. Yet it took two motions by defendant — one that the court denied under the misguided view that defendant was obligated to provide a treatment plan and evidence to secure diversion — and over six months for the court to order the reports that it was required to consider when deciding whether to grant diversion under section 1001.20 et seq. While we are sympathetic to the difficulties of managing a criminal calendar

32

and following the detailed requirements of the developmental disability diversion statutes, we cannot condone the trial court's failings in this case.[6]

Defendant and amici curiae next argue that RCRC failed to provide required services while defendant was incarcerated and RCRC improperly reported on its concerns about supervising defendant, which the court relied upon to deny diversion. RCRC inexplicably did not provide services to defendant while she was in jail despite the fact that she had been declared a regional center client, but the record does not show that the court relied upon the lack of established services or RCRC's concerns to deny diversion. The court recited RCRC's concern about lack of established services and supervision on the record, but it did so in the context of rejecting the People's attack on the specificity of RCRC's revised report before turning to "more important consideration[s]" and explaining the grounds upon which the court was denying diversion.

Next, defendant and amici curiae rightfully take issue with RCRC's reports, contending they failed to comply with section 1001.22, subdivision (a). The People respond that defendant forfeited contentions about the quality of the reports by not objecting below. We need not decide whether forfeiture principles apply here because we would exercise our discretion to decide whether the RCRC reports omitted the information required by statute in any event, which is a question of law on undisputed facts. Moreover, in light of the paucity of published opinions regarding the developmental disability statutes, it seems likely that trial courts, regional centers, probation departments, and counsel would benefit from guidance.

---

[6] Considering our conclusion that other errors in this case require reversal *post*, we need not decide whether the trial court's errors were cured because it "ultimately fulfilled its duty by ordering the required reports" as the People suggest.

Under the statutory scheme, the court must consult with the regional center to determine whether a defendant may be diverted, and, when the defendant consents to the diversion process and waives his or her right to a speedy trial, the court must order certain reports with specified information. (§ 1001.22 [requiring trial court to "order the prosecutor, the probation department, and the regional center to prepare reports on specified aspects of the defendant's case"].) "The regional center's report shall include a determination as to whether the defendant has a developmental disability and is eligible for regional center diversion-related treatment and habilitation services, and the regional center shall also submit to the court a proposed diversion program, individually tailored to the needs of the defendant as derived from the defendant's [IPP] pursuant to Section 4646 of the Welfare and Institutions Code, which shall include, but not be limited to, treatment addressed to the criminal offense charged for a period of time as prescribed in Section 1001.28." (§ 1001.22, subd. (a).) The statute thus contemplates that defendant may have to be evaluated for eligibility for regional center services, and, if he or she qualifies, the regional center must then develop an IPP that it will use to submit a proposed diversion program to the court. (*Id.* at subd. (a); see also Welf. & Inst. Code, § 4640.6, subds. (c)(6)(A) & (C)(viii) [setting average service coordinator-to-consumer ratio at regional centers for defendants who are placed in county jail and eligible for diversion].) "The regional center's report shall also contain a statement whether the proposed program is available for the defendant through the treatment and habilitation services of the regional centers pursuant to Section 4648 of the Welfare and Institutions Code." (§ 1001.22, subd. (a).)

RCRC undisputedly did not develop an IPP for defendant, and, as alluded to in footnote 6, *ante*, its reports do not include an individually-tailored proposed diversion program "as derived from the defendant's [IPP], which shall include, but not be limited to, treatment addressed to the criminal offense charged for a period of time as prescribed in Section 1001.28." (§ 1001.22, subd. (a).) RCRC's reports also failed to state whether the proposed diversion program was available for the defendant pursuant to Welfare and Institutions Code section 4648, which, as amici curiae point out, may have led to some confusion in the trial court regarding the source of the funding for a proposed diversion program. On remand, the trial court should order RCRC to provide a new report for the hearing that complies with the mandates of section 1001.22, subdivision (a), and the court shall consider that report at the diversion hearing.[7]

*Additional Amici Curiae Arguments*

Amici curiae also contend in this appeal that the trial court's ruling violates: (1) the Racial Justice Act (RJA), and (2) *Olmstead v. L.C.* (1999) 527 U.S. 581, which held that unnecessary institutionalization of individuals with disabilities is a form of discrimination prohibited by Title II of the Americans with Disabilities Act of 1990. Defendant joined these arguments after they were made. We decline to address newly-raised contentions that were not argued below. (See *People v. Lashon* (2024) 98 Cal.App.5th 804, 816 [RJA claims that could have been but were not raised below were forfeited]; *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 [parties forfeit arguments not raised in trial court]; *California Assn. for Safety Education v. Brown* (1994)

---

[7] We do not address the additional arguments that amici curiae raise for the first time on appeal regarding additional alleged improprieties of the prior RCRC reports.

30 Cal.App.4th 1264, 1275 [courts refuse to consider amicus curiae arguments when those arguments are not presented in trial court and urged by parties on appeal].)

Finally, amici curiae contend (again joined by defendant) that the trial court erred in adding a statutory " 'suitability' " requirement to the relevant statutes.  The People respond that the court used the word "suitability" as a shorthand for the global assessment of whether the defendant would benefit from diversion.  We note that the trial court, the prosecution, and defense counsel all appear to have used the term "suitable" below at various times, but we need not delve further into this issue.  As we have stated previously herein, the trial court has discretion to grant a request for developmental disability diversion, and this discretion must be exercised in light of the rehabilitative purpose of the statutory scheme.  (See *Wade, supra*, 33 Cal.App.5th at pp. 707, 716–717; *Qualkinbush, supra*, 79 Cal.App.5th at p. 891.)  The court must be satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community.  (§ 1001.23, subd. (b).)  And the court's exercise of discretion and consideration of specified statutory criteria must be founded upon the standard set forth in the statute:  whether the defendant is a person "who would benefit by diversion."  (*Ibid.*)  The court is to apply this standard on remand.

*Remedy*

Defendant asks this court to reverse and order the trial court to admit her to a diversion program, and the People argue for affirmance under California's harmless error standard (*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)).  (See *People v. Bunas* (2022) 79 Cal.App.5th 840, 866; *People v. Hall* (2024) 99 Cal.App.5th 1116, 1126; *Wade, supra*, 33 Cal.App.5th at

36

pp. 714, 718 [finding prejudicial legal error where court failed to exercise discretion in conformity with section 1001.80].)  Under *Watson*, defendant must show "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson,* at p. 836; cf. *Strickland v. Washington* (1984) 466 U.S. 668, 693–694 ["reasonable probability" does not mean "more likely than not," but merely "probability sufficient to undermine confidence in the outcome"].)

The numerous errors here were not harmless.  The court mentioned the charged crime multiple times without relating this criteria to the proper inquiry of whether defendant would benefit from diversion-related treatment; the court should have used the relationship between defendant's developmental disability and the charged offenses as a factor militating in favor of diversion; the court's reliance on defendant's lack of employment and assets to deny diversion was erroneous; and RCRC did not provide the court with a proper report or diversion program individually tailored to defendant's needs for consideration in determining whether she would benefit from diversion-related treatment.  The People correctly point out that the court was concerned about defendant's poor performance on probation, and the strength of her connections to family in Fresno.  However, given the number and magnitude of the errors at issue, defendant has shown a reasonable probability of a more favorable result in absence of the errors.  Remand is required so that the court can exercise informed discretion with the information required by statute, keeping in mind the ultimate question of

whether, in light of the statutorily-prescribed considerations, defendant is "a person who would benefit by diversion."[8] (§ 1001.23, subd. (b).)

## DISPOSITION

The judgment is conditionally reversed. The matter is remanded to the trial court with directions to hold a diversion eligibility hearing under section 1001.20 et seq. The court is to comply with the statutory requirements under section 1001.20 et seq., including the requirement that the court order the regional center to provide a report and proposed diversion program compliant with section 1001.22, subdivision (a) for consideration at the hearing. If the court is satisfied that defendant will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community, and the court determines that defendant would benefit from diversion, it shall grant either single or dual agency diversion. (§ 1001.23, subd. (b).) If defendant satisfactorily completes diversion, the court shall dismiss the charges. (§ 1001.31.) If the court does not grant diversion, or if the court grants diversion but defendant does not complete it satisfactorily, the court shall reinstate defendant's conviction.

BROWN, P. J.

WE CONCUR:

STREETER, J.
SIMONDS, J.*

*People v. K.D.* (A168538)

---

[8] We express no opinion as to the result the trial court should reach in exercising its discretion on remand.

\* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:          Mendocino County Superior Court

Trial Judge:          Hon. Keith Faulder

Counsel:              Amanda K. Roze, under appointment by the Court of
                         Appeal, for Defendant and Appellant

                      Will Leiner, Andrea Rodriguez, Susan Sindelar; and
                         Claudia Center for Disability Rights California and
                         Disability Rights Education & Defense Fund as Amici
                         Curiae on behalf of Defendant and Appellant.

                      Rob Bonta, Attorney General, Lance E. Winters, Chief
                         Assistant Attorney General, Jeffrey M. Laurence,
                         Assistant Attorney General, Bridget Billeter and
                         Christine Oh, Deputy Attorneys General, for Plaintiff
                         and Respondent